**JAMES B. MARTIN**
District Attorney



## OFFICE OF THE DISTRICT ATTORNEY
LEHIGH COUNTY COURTHOUSE

455 WEST HAMILTON STREET
ALLENTOWN, PENNSYLVANIA 18101-1614
PHONE (610) 782-3100    FAX (610) 820-3323

February 13, 2019

The Honorable Gerald J. Pappert
U.S. District Court
Eastern District of Pennsylvania
5614 U.S. Courthouse
601 Market Street
Philadelphia, PA  19106--1745

**RE:  JUNIUS BURNO v. JOHN E. WETZEL, _et al_.**
**CIVIL ACTION NO.  15-cv-6307**

Dear Judge Pappert:

 Enclosed please find the original copy of the Commonwealth/Respondent's _Memorandum of Law in Response to Petition for Writ of Habeas Corpus,_ along with _Certificate of Service_, in the above-captioned matter, which has been filed with the Clerk today.

     Respectfully yours,

     /s/ CHRISTINE F. MURPHY
     Deputy District Attorney

CFM/mcr
Enclosures

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JUNIUS BURNO,** | : | |
| **Petitioner** | : | |
| | : | **CIVIL ACTION NO.** |
| **v.** | : | |
| | : | **15-cv-6307** |
| | : | |
| **JOHN E. WETZEL, <u>et al</u>.,** | : | |
| **Respondents** | : | |

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on this date, I have served a true and correct copy of the attached document through the Court's cm/ecf procedures upon the person(s) in the manner indicated below:

<u>**Copy will be delivered via Electronic-Mail to:**</u>

The Honorable Gerald J. Pappert                 thru cm/ecf procedures
*U.S. District Court Judge*

<u>**Copy will be delivered via First-Class Mail to:**</u>

Junius Burno, Inmate #GZ-5987
@ SCI-Greene
P.O. Box 33028
St. Petersburg, FL  33733
*Pro se Petitioner*

**Date:  <u>February 13, 2019</u>**            /s/ CHRISTINE F. MURPHY
                                Deputy District Attorney
                                Lehigh County Courthouse
                                455 West Hamilton Street
                                Allentown, Pa  18101
                                *Attorney for the Respondents*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **JUNIUS BURNO,** | | : | |
| | **Petitioner** | : | |
| | | : | **CIVIL ACTION NO.** |
| **v.** | | : | |
| | | : | **15-cv-6307** |
| | | : | |
| **JOHN E. WETZEL,** _et al_., | | : | |
| | **Respondents** | : | |

**MEMORANDUM OF LAW IN RESPONSE**
**TO PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner is a Pennsylvania state prisoner who was sentenced to death after being found guilty of two counts of first-degree murder.  He and his co-defendant, Terrence Bethea, shot and killed Carlos Juarbe and Oscar Rosado during a botched robbery for money and drugs in 2003.  The procedural history of this matter is set forth more fully below.

On November 23, 2015, petitioner initiated this federal action by filing a petition for writ of habeas corpus seeking collateral review of his state-court conviction.  At that time, his direct appeal remained pending before the Pennsylvania Supreme Court and his habeas claims were, therefore, unexhausted.  Over petitioner's objection, by Order dated September 6, 2016, this Court stayed the matter and held it in abeyance pending resolution of his direct appeal.  Petitioner filed an appeal to the United States Court of Appeals for the Third Circuit challenging the stay-and-abey Order.  The federal Court of Appeals dismissed the appeal as moot by Order dated June 6, 2017, noting that during the pendency of the federal appeal, the Pennsylvania Supreme Court had affirmed petitioner's conviction and death sentence, thereby resolving petitioner's directing appeal and effectively lifting the stay.

The parties then litigated petitioner's request to represent himself, a request which was granted after a hearing; and the Court established a briefing schedule on the merits of the petition. However, petitioner filed a Motion to Recuse, claiming this Court had shown bias by placing his case in a stay-and-abey posture and by appointing counsel, and had "misled" and "displayed disdain" for petitioner. The motion was denied and petitioner again appealed to the Court of Appeals for the Third Circuit. His appeal was dismissed for lack of jurisdiction by the Court of Appeals' Order filed December 13, 2018, thereby restoring this Court's jurisdiction to proceed with the habeas petition. This Court directed Respondents to respond to the merits of the petition and graciously extended Respondents' time to do so until February 13, 2019. Hence, this Response.

For the following reasons, Respondents respectfully request that the petition be denied and dismissed in part as procedurally defaulted, and as meritless.

### Facts and Procedural History

The trial court summarized the facts as follows:

> Succinctly summarized, the evidence at trial, viewed in the light most favorable to the Commonwealth as the verdict winner, indicated that on April 12, 2003, Defendant set out with his friend, Terrance Bethea, for an evening of revelry. Armed with handguns Defendant and Bethea had stolen on earlier occasions, they entered the apartment rented by Carlos Juarbe, intending to rob Juarbe of money and drugs. Juarbe, accompanied by Oscar Rosado, evidently suspected something to be amiss and was prepared for the encounter with a sawed-off shotgun at the ready. As Bethea and Juarbe engaged in a struggle, Juarbe shot Bethea in the leg and Bethea emptied his gun into Juarbe. The Commonwealth alleged that Defendant finished off Juarbe and then killed Rosado with a single shot to the head.

> Bethea, reeling from the shot-gun wound to his leg, and Defendant then descended the stairs from the apartment, leaving a trail of blood. Afraid that outstanding arrest warrants in Lehigh County might complicate the receipt of medical care at a local hospital, Bethea directed Defendant to transport him to an emergency room in Philadelphia. In preparation for the journey, the duo returned to Bethea's apartment and arranged for another

friend to bring another car and some money.  Defendant, Bethea, and Bethea's wife then drove to a hospital in Philadelphia.  Bethea gave false information to the hospital staff in order to cover up the true cause of his injuries; however, blood recovered at the scene eventually led police to Bethea, who, in turn, implicated Defendant.  Both men gave statements to police in which they admitted involvement in the killings.

More specifically, the Commonwealth's evidence included testimony of Juarbe's neighbor, Mary Moyer, who stated that in the pre-dawn hours of April 13, 2003, she heard a ruckus, a loud boom, and then a succession of seven or eight gunshots.  She went out to investigate and saw a maroon car turn around and speed away without its headlights on.  (See Notes of Testimony ("N.T."), Deb. 26, 2007, at 69-70.)  She then saw blood on the ground and dialed 911.  (Ibid.)

According to the testimony of Allentown Police Officer Scott Derr, at 3:14 a.m., on April 13, 2003, the Allentown Police received a telephone call reporting gunshots and a car fleeing the scene of 2628-30 South Fourth Street in Allentown.  (Id. at 57-59)  Officer Derr responded and observed flesh (sic) blood running down the wall in the stairway to Juarbe's second-floor apartment.  (Id. at 60.)  Upon entering the dwelling, Officer Derr found numerous shell casings and observed the body of Juarbe supine in the living room and that of Rosado in the bedroom reposed in a fetal position up against the wall.  (Id. at 62-63.)

Detective Sergeant Joseph Effting of the Allentown Police also responded to the scene and was in charge of the collection of evidence.  (Id. at 85.)  Sergeant Effting, whose testimony was corroborated by photos and video taken of the crime scene, observed evidence consistent with a struggle, including pictures askew on the apartment walls, furniture toppled over, and a sawed-off shotgun on the floor on the living room.  (Id. at 85-88.)  Blood samples from the scene were swabbed for analysis and bullets were recovered from the scene.  (Id. at 90-118.)  Alex Glessner, a forensic scientist in the Pennsylvania State Police DNA Lab, testified that blood from the scene matched data on file relating to Bethea.  (Id. at 160-69.)

In September of 2003, after the results were communicated to him by the State Police, Det. Wayne Simock of the Allentown Police Department arrested Defendant.  (N.T., Feb. 27, 2007, at 195-96.)  Defendant, thereafter, gave several statements to the police.  Initially, Defendant explained that he and Bethea had contemplated a concocted story in which they were both in Juarbe's apartment enjoying a friendly visit when two armed intruders rushed in and they got caught in the cross fire.  (Id. at 213-15.)  On September 24, 2003, however, Defendant gave a taped statement to police in which he admitted his involvement in the crime.  He explained that some months before the killings, Bethea had informed him

that Bethea had burglarized his neighbors' apartment in Catasauqua and obtained two handguns, including a nine-millimeter model, which Bethea then gave to Defendant.  (See Ex 74A.)  Defendant further explained that he had a falling out with his ex-wife Michele Wright, and in April 2003, when she asked him to retrieve some medicine for their daughter who had been hospitalized for a tonsillectomy, he availed himself of the opportunity to steal a .38 caliber handgun from underneath her bed.  (Ibid.)  Wright's testimony corroborated that account.  (See N.T., Feb. 28, 2007, at 363-66.)

Defendant stated that he and Bethea began the evening of April 12, 2003, by "hanging out" and getting high at Bethea's apartment.  (See Ex 74A.)  Later, they set out in Defendant's Hyundai automobile and began driving around.  (Ibid.)  Their travels took them to south Bethlehem where they came across Juarbe, also known as "D," on the street in front of CJ's Bar.  (Ibid.)  Bethea inquired if "D" had any drugs; "D" allegedly replied that he had some back at his apartment and invited Bethea to stop by.  (Ibid.)  Defendant and Bethea eventually made their way over to Juarbe's apartment in south Allentown, where Bethea planned to trade the .38 caliber pistol, which Defendant had stolen from his ex-wife, for drugs and money.  (Ibid.)  However, according to this account, while Defendant remained in his car, he heard a series of gunshots and then saw Bethea emerge from the apartment with a wounded leg.  (Ibid.)  Defendant helped Bethea into the car, drove off and threw two guns out of the car window.  (Ibid.)  Bethea, however, refused to be taken to a local hospital because of outstanding warrants for his arrest.  (Ibid.)  Defendant made arrangements with his friend James "Prince" Alford to exchange cars and to drive Bethea to the emergency room at the Albert Einstein Medical Center in Philadelphia.  (Ibid.)  Defendant claimed that he later recovered the guns, destroyed them, and disposed of their remnants in the Delaware River and Mauch Chuck Lake.  (Ibid.)

Finally, on September 26, 2004[1], Defendant gave another statement to the police.  (See Ex 76.)  In that statement, Defendant confessed that he and Bethea went to Juarbe's apartment that evening with the understanding that they were going to "punk" Juarbe, or rob him of drugs and money, in retaliation for Juarbe making unfriendly comments about Bethea in the social circle in which the men circulated.  (Ibid.)  Defendant further admitted not only to being in the apartment, but also to "struggling" with Rosado and shooting him in the bedroom with a nine-millimeter handgun.  (Ibid.)

Although at trial Alford denied any knowledge of Defendant's involvement, he, too, had given a taped statement to police.  In that statement, he explained how Defendant coordinated the exchange of the

---

[1]     The correct year of this statement was 2003.

vehicles with him and further described how Defendant had confided in him that he and Bethea had shot Rosado and Juarbe.  (See Ex 131.)

The Commonwealth also called to the stand Dr. Samuel Land, a forensic pathologist who performed an autopsy on Rosado.  (N.T., Feb. 27, 2007, at 232.)  Dr. Land testified that Rosado died of a gunshot wound to the head.  (Id. at 232-35.)  The bullet entered the left ear and then severed the jugular vein and carotid artery as it proceeded downward into the body.  (Ibid.)  Based on the trajectory, Dr. Land concluded that the gunman was above Rosado at the time of the shooting.  (Id. at 236.)

Another forensic pathologist, Dr. Sara Lee Funke, performed an autopsy of Juarbe.  In the course of that procedure, she recovered two different types of bullets from the body.  (See N.T., Feb. 28, 2007, at 319-24.)  She testified that one type of bullets, a leaded, non-jacketed projectile, entered the body from both contact and non-contact wounds, as indicated by the presence or absence of injury to the skin surrounding the point of entry.  (Ibid.)  She opined that contact wounds and the positions and trajectories of their entries were consistent with a struggle between the victim and the assailant.  (Id. at 332, 344.)  She testified that the other type of bullet recovered from the body, the jacketed ammunition, did not enter through a contact wound.  (Id. at 324-25.)

While being detained at Lehigh County Prison, Defendant share a cell block with an inmate by the name of David Rawlins.  (N.T. Feb. 27, 2007, at 260.)  Rawlins – who agreed to cooperate in exchange for the prospect of favorable treatment of his own, unrelated charges – testified that while the two were in county prison, Defendant explained to him how things had gone down at Juarbe's apartment.  (See N.T., Feb. 28, 2007, at 392-95.)  According to Rawlins, Defendant told him that Juarbe's gun went off, Bethea got shot, and then Defendant came to Bethea's aid and shot Juarbe.  Rawlins further testified that Defendant also told him that Rosado had dropped to his knees and begged for his life before Defendant told him to "stop crying" and shot him.  (Id. at 396.)

A ballistics expert, Sergeant Eric Wolfgang of the Pennsylvania State Police, analyzed the ammunition recovered from the scene and concluded that two guns were utilized in the event,  The jacketed bullets came from a nine-millimeter handgun and the non-jacketed bullets consisted of a .38 Special multi-ball ammunition compatible with the gun Defendant had stolen from his ex-wife.  (See, id. at 431-35.)  In addition to Defendant's statements in which he admitted to firing the nine-millimeter weapon, the Commonwealth also introduced testimony of Bethea's neighbors, the DeMaria's, who had a nine-millimeter handgun, a stereo, and telephone stole only days after informing Bethea that they would be out-of-town for a few days.  One of the neighbors later saw the stereo and phone

in Bethea's apartment.   (See, id. at 446-54.)   Police also recovered Defendant maroon Hyundai, which tested positive for Bethea's blood in the front passenger seat.  (See N.T., Mar. 1, 2007, at 474-478.)

Finally, while housed at Lehigh County Prison, Defendant made several phone calls that were subject to recording in the course of normal operating procedure.  (See N.T., Feb. 27, 2007, at 255-59.)  Among those were repeated calls to his wife and Alford, in which Defendant admitted involvement in the shootings.  (See N.T., Mar. 1, 2007, at 479-84.)

In his defense, Defendant took the stand and stated that although he did steal the .38 caliber pistol from his ex-wife and give it to Bethea, (id. at 501) and he and Bethea did travel to Juarbe's apartment that evening after drinking beer and snorting cocaine (id. at 506-518), he remained in the car while Bethea went inside (id. at 521-22).  After hearing shots, he saw Bethea come out from the building, assisted him into the vehicle, and the two drove off.  (See id. at 525-29.)  He then arranged to trade cars with Alford in order to drive Bethea to Philadelphia, and it was only after watching the news the next day that he first learned that tow men had been killed the night before. (See id. at 551-52.)  He attempted to explain away his confession by claiming that he was scared of the death penalty and that his lawyer advised him that Bethea was going to lay all the blame on him; therefore, he concluded that he had to give the police all they wanted even if that meant fabricating and exaggerating the extent of his own involvement in the killings.  (Id. at 589-607.)[2]

Finally, in rebuttal, the Commonwealth presented a statement by Defendant that had been suppressed on Sixth Amendment grounds and thus kept out of its case in chief.  That statement contradicted Defendant's in-court testimony of what transpired on the night in question and, instead, indicated Defendant had shot both men.

(Opinion, Reibman, J., 10/1/09, 2-8).

On March 5, 2007, a jury sitting before the Honorable Edward D. Reibman, Judge of the

Court of Common Pleas of Lehigh County, found petitioner guilty of two counts of First-Degree

Murder.  Following a penalty hearing on March 6, 2007, the jury found one aggravating

circumstance – that petitioner was convicted of another murder committed at the same time as

---

[2]      At trial, the jury was played recordings of defendant's two statements to police.  The jury was provided with transcripts to read while listening to the statements.  The first recorded statement was on September 24, 2003 and the second occurred on September 26, 2003.

the murder at issue – and determined that this aggravating circumstance outweighed any mitigating factors.  Therefore, the jury sentenced petitioner to death.

Petitioner filed post-sentence motions.  Evidentiary hearings were held on February 10, 2009 through February 12, 2009.  On September 30, 2009, Judge Reibman granted petitioner's post-sentence motion for a new trial and vacated his death sentence based on the prosecutor's purportedly improper closing argument and trial counsel's ineffective assistance of counsel for not objecting to the allegedly improper comments (Opinion, Reibman, J., 9/30/09, 21).

The Commonwealth appealed the grant of a new trial.  Petitioner filed a cross-appeal.  On June 16, 2014, the Pennsylvania Supreme Court reversed the lower court's grant of a new trial, finding that the prosecutor's closing argument was not improper and trial counsel was not ineffective for not objecting.[3]  With regard to petitioner's cross-appeal, the court remanded the case for resolution of preserved claims related to trial court error.  The court further dismissed petitioner's allegations of ineffective assistance of counsel without prejudice, noting that those claims must be raised in a PCRA petition.

On September 28, 2015, the trial court denied all of petitioner's post-sentence motions.[4]  By Opinion dated February 22, 2017, the Pennsylvania Supreme Court affirmed petitioner's conviction and death sentence.[5]  Petitioner did not file a petition for writ of certiorari in the

---

[3]      A copy of the Pennsylvania Supreme Court's June 16, 2014 Opinion is attached as Exhibit A.

[4]      On September 28, 2015, the trial court issued two Orders and Opinions.  One denied all of petitioner's post-sentence motions.  It is attached as Exhibit B.  The other denied petitioner's Motion to Dispense with Counsel and Proceed Pro Se.  It is attached as Exhibit C.

[5]      A copy of the Pennsylvania Supreme Court's February 22, 2017 Opinion is attached as Exhibit D.  As discussed more fully below, the Supreme Court found merit to one of petitioner's arguments – that the trial court should have suppressed one of his statements to police because it was obtained in the course of plea negotiations – but that its admission at trial was harmless error because it was cumulative of other evidence that was appropriately admitted.  On all of petitioner's other claims, the Court found no merit, and affirmed his judgment of sentence.  The February 22, 2017 slip opinion on direct appeal is referred to herein as "Burno II".

Supreme Court of the United States.  Therefore, his judgment became final 90 days later, on May 22, 2017.

Petitioner did not file a petition for post-conviction review under the Pennsylvania Post-Conviction Relief Act (PCRA), and has been clear that he does not intend to do so.  In any event, at this point his time to do so has expired, and he would be unable to obtain relief under the PCRA.  Although his claims requiring exhaustion through PCRA review are procedurally defaulted as discussed more fully below, the petition for writ of habeas corpus is nevertheless ripe for disposition, and should be denied.

### *Discussion*

Petitioner alleges seven grounds for relief in his petition for writ of habeas corpus. Ground One alleges petitioner was denied the right to file an interlocutory appeal.  Ground Two alleges denial of a speedy trial.  Ground Three alleges petitioner was denied his right to self-representation on direct appeal and that he was forced to accept "hybrid" representation.  Ground Four alleges there was no probable cause to arrest petitioner.[6]

Grounds Five, Six, and Seven concern the admissibility of petitioner's September 26, 2003 statement to police, the first part of which was suppressed by the trial court.[7]  In Ground Five, petitioner alleges "prosecutorial misconduct," specifically that petitioner was coerced into making a false confession by the prosecutor during what petitioner characterizes as an

---

[6]     Ground Four also mentions ineffective assistance of counsel, and that petitioner's September 26, 2003 confession was coerced.  However, these issues are raised independently in Grounds Five, Six and Seven.

[7]     As discussed more fully below, the September 26, 2003 statement arose after petitioner failed a polygraph test.  He then gave a two-part confession that day.  The first part occurred before petitioner's attorney arrived, albeit with his permission, which had been given by phone.  The second part occurred after his attorney arrived.  Both parts were fully inculpatory.  The trial court concluded it had been improper for the questioning to take place without counsel's presence, and suppressed the first part of the statement.  Nevertheless, the trial court permitted the second, counseled part of the statement to be admitted at trial.

unrecorded, unmirandized interview he was "forced to attend", at which his attorney was not present.  Petitioner also alleges in Ground Five that his trial counsel failed to raise this claim.

Ground Six alleges that the September 26, 2003 statement should have been suppressed because it was made during "plea negotiations/discussions" and that his trial counsel was ineffective in failing to raise the issue.  Finally, Ground Seven argues that the statement should have been suppressed in its entirety, rather than only the first portion.  Petitioner claims that although his attorney arrived partway through the interview, the Commonwealth did not show that "the taint had been purged" and the trial court erred in suppressing only the portion of the interview which occurred before counsel arrived.

The merits of all of these claims were correctly determined by the state courts, and/or are procedurally defaulted as unexhausted, but nevertheless are meritless.  Accordingly, for the following reasons, the petition should be denied.

### *Standard of Review*

The Antiterrorism and Effective Death Penalty Act ("AEDPA") precludes habeas relief on any claim that was adjudicated on the merits in state-court proceedings unless the adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  A federal habeas court may not issue a writ of habeas corpus "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Williams v. Taylor,

529 U.S. 362, 410 (2000).  Rather, to warrant habeas relief, the state-court ruling must be "objectively unreasonable".  Id. at 409.

This standard creates "'a substantially higher threshold' for obtaining relief than *de novo* review", as AEDPA "demands that state-court decisions be given the benefit of the doubt". Renico v. Lett, 559 U.S. 766, 130 S.Ct. 1855, 1862 (2010)(internal citations omitted).  Under this deferential standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770, 786 (2011).  That is, a habeas court must "determine what arguments or theories supported or…could have supported the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent" with Supreme Court precedent.  Id.

The standard is meant to be difficult to meet and the writ may issue only in cases "where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts" with Supreme Court precedents. Id.  A petitioner can only obtain habeas corpus relief in federal court upon a showing that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement." Id. at 786-787.

Moreover, the factual findings of state trial and appellate courts are presumed correct on habeas review, a presumption which can only be overcome on the basis of clear and convincing evidence to the contrary.  Stevens v. Delaware Correctional Center, 295 F.3d 361, 368 (3d Cir. 2002).  Finally, "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Thus, this court may decline to follow a state intermediate appellate court's opinion with respect to

state-law determinations only in "extraordinary and compelling circumstances". Johnson v. Rosemeyer, 117 F.3d 104, 115 (3d Cir. 1997).

A federal district court cannot consider claims on habeas review unless they have been exhausted in state court.  28 U.S.C. § 2254(b)(1)(A).  To satisfy this requirement, petitioner must "fairly present" his federal claims at each level of the state courts, thereby giving the state courts the opportunity to remedy any alleged constitutional violations.  Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000).  "Fair presentation requires that the same legal claim, i.e., the same legal theory applied to the same facts, has been presented at all levels of the state judicial system." Kowalewski v. McGrady, 2011 WL 4482622, at *5 (E.D.Pa. Sept. 8, 2011) (citing Lines, supra.)

The petitioner bears the burden of establishing that each of his habeas claims was fairly presented.  Id.  Generally, claims that have not been properly exhausted are not reviewable in federal court, and are considered procedurally defaulted.  See Gray v. Netherland, 518 U.S. 152, 161-162, 116 S.Ct. 2074, 2080, 135 L.Ed. 2d 457 (1996).  Nevertheless, a habeas corpus petition may be denied on the merits, notwithstanding any failure to exhaust state-court remedies.  Lines, 208 F.3d at 159 n.8; 28 U.S.C. § 2254(b)(2).

Here, none of petitioner's claims meet the standard required for habeas relief.

Initially, any claims of ineffective assistance of counsel must be raised first in a petition for relief under the Pennsylvania Post-Conviction Relief Act (PCRA), which petitioner did not file and has indicated he does not wish to file.  As the Pennsylvania Supreme Court discussed in its June 16, 2014 Opinion reversing the grant of a new trial on post-trial motions, petitioner's claims of ineffective assistance of counsel were not addressed on the merits, but were deferred to PCRA review and therefore dismissed without prejudice.  Commonwealth v. Burno, 626 Pa. 30, 56, 94 A.3d 956, 971 (Pa. 2014)("Burno I").  Nor did he exhaust his claim that his rights were

11

violated by the appointment of counsel to represent him on appeal.[8]  Accordingly, all of these claims should be dismissed as unexhausted and therefore procedurally defaulted.

Ground One

Ground One alleges petitioner was denied the right to file an interlocutory appeal.  This appears to refer to his cross-appeal, which petitioner filed after the Commonwealth appealed the trial court's September 30, 2009 order granting petitioner a new trial.  In its June 16, 2014 Opinion, the Pennsylvania Supreme Court dismissed his cross-appeal without prejudice to raise his claims under the PCRA.  Specifically, the Court noted that all of petitioner's claims raised in that cross-appeal sounded in ineffective assistance of counsel.

On post-trial motions, the trial court had granted petitioner a new trial based on his related claims of improper prosecutorial argument in closing, and his trial counsel's failure to object to such.  Although petitioner had raised other claims of ineffective assistance of counsel in his post-trial motion, the trial court had ruled only on those related claims, and concluded it was unnecessary to reach the other issues.  Accordingly, when the appellate court granted the Commonwealth's appeal and reversed the granting of a new trial, it was necessary to remand the matter back to the trial court to address the remaining post-trial motions that had not been reached.

---

[8]     Ground Three states that petitioner was denied the right to represent himself on direct appeal, and notes on page 16 of the petition that "court appointed counsel has filed an appeal that [petitioner] did not request, authorize, want and/or acquiesce to."  In litigating his post-trial motions, petitioner filed a Motion to Dispense with Counsel and Proceed Pro Se.  After a hearing, the trial court denied his motion by Order and Opinion dated September 28, 2015 (Exhibit C), concurrently with the Order denying petitioner's post-trial motions.  In it, the court concluded that, given the posture of the post-trial motions at that point (fully briefed and ripe for disposition), permitting petitioner to represent himself would unnecessarily and inappropriately delay the proceedings.

Petitioner did not exhaust state-court appellate remedies on this issue.  But in any event, as Judge Reibman noted, there is no federal constitutional right to represent oneself on direct appeal.  Martinez v. Court of Appeal of California, 528 U.S. 152 (2000).  Therefore, even assuming petitioner had successfully raised this issue on appeal to the Pennsylvania Supreme Court, he would be unable to establish that the state courts are in violation of clearly established federal law that would warrant habeas relief on this issue.

The Supreme Court also noted that when the trial court considered petitioner's post-trial motions, it did not have the benefit of Commonwealth v. Holmes, 79 A.3d 562 (Pa. 2013).  In Holmes, the Pennsylvania Supreme Court addressed the trial court's discretion to consider ineffective assistance of counsel claims on direct appeal.  Although Holmes allowed for such discretion under certain circumstances, the Pennsylvania Supreme Court in the instant case determined that it was more appropriate to reserve petitioner's claims for PCRA review in order to prevent an "extra round of collateral attack".  Burno I, 626 Pa. at 56.  Accordingly, the Court dismissed petitioner's cross-appeal without prejudice for him to raise his claims of ineffective assistance of counsel claims on PCRA review.

Petitioner appears to claim, in Ground One, that this was an inappropriate dismissal of what he terms an interlocutory appeal, claiming that that "[Petitioner] was absolutely entitled to pursue his appeal when he did, how he did and for the reasons he did."  (Petitioner's brief, at 14.) However, "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  Estelle, 502 U.S. at 67-68.  Not only has petitioner failed to show that the Pennsylvania Supreme Court's dismissal of his claims without prejudice violated any clearly established federal law, he has certainly not shown "extraordinary and compelling circumstances" which would permit this Court to decline to follow the Pennsylvania appellate court's determination on this state-law issue.  Johnson, 117 F.3d at 115.

On the contrary, his claim that the dismissal resulted in a due process violation and that the dismissal of his appeal at that juncture "has irreparably prejudiced him....due to the loss of it forever" (Petitioner's brief, at 20) is simply disingenuous.  Nothing was lost to him forever.  His claims of ineffective assistance of counsel were dismissed *without prejudice*.  He could have raised those claims in a PCRA petition; and he had plenty of time during which he could have

done so.  Indeed, part of the reason this federal habeas litigation was stayed was to give petitioner the opportunity to exhaust his claims through PCRA review.  He has repeatedly chosen not to file a PCRA petition, defiantly clinging to his notion of entitlement to pursue his claims in the manner he sees fit.

Petitioner has not shown that the dismissal without prejudice of his claims violated any clearly established federal law or that the state court's ruling was "objectively unreasonable". Williams, 529 U.S. at 409.  On the contrary, the state court and this Honorable Court have given petitioner every opportunity to pursue his claims in an appropriate manner and he has chosen not to do so.  He is entitled to no relief on Ground One.

Ground Two

Ground Two alleges denial of a speedy trial.  Although his brief outlines extensively the procedural history of his case as it languished in the trial court, it is apparent that he only contests the delay caused by the Commonwealth's interlocutory appeal taken from the trial court's decision to relegate the lead prosecutor to second chair.[9]  Notably, this appeal was eventually resolved in the Commonwealth's favor.  Nevertheless, petitioner claims the Commonwealth failed to exercise due diligence in filing the appeal.

Petitioner's claim that he was not brought to trial within 365 days as required by Rule 600 of the Pennsylvania Rules of Criminal Procedure is not cognizable on habeas review because it does not implicate federal law.  See Harris v. Steberger, 2017 WL 2691984, at *2 (E.D.Pa. June 22, 2017)(Pappert, J.)(citing Walker v. Kerestes, 2013 WL 6667776 (E.D.Pa. Dec. 18,

---

[9]       As discussed below, First Assistant District Attorney Maria L. Dantos was involved in an interview petitioner gave to police on September 26, 2003.  Petitioner filed a pre-trial motion seeking assignment of a new prosecutor on the basis that Attorney Dantos could be a witness at trial regarding the voluntariness of petitioner's confession.  The trial court granted the motion in part, relegating Attorney Dantos to second chair instead of lead prosecutor.  The Commonwealth filed an interlocutory appeal to the Superior Court, and ultimately prevailed.  See Burno II, at 5-6.

2013)(Brody, J.)).  "The mere violation of the state's rules of criminal procedure is not sufficient to state a viable habeas claim."  Walker, 2013 WL 6667776, at *10 (quoting Bridgeford v. Varan, 2012 WL 3536055, at *6 (E.D.Pa. Apr. 26, 2012)(Hey, M.J.)(approved and adopted, 2012 WL 3536025, at *1 (E.D.Pa. Aug. 15, 2012)(Savage, J.)).

To the extent petitioner's claim could be construed more broadly as asserting a violation of his right to a speedy trial under the Sixth Amendment to the United States Constitution, it is unexhausted.  A review of the Pennsylvania Supreme Court's decision on this issue shows that it considered the claim only under Rule 600, not under federal law.  Moreover, a review of petitioner's counseled brief on direct appeal reveals that petitioner did not raise or discuss any federal speedy trial law.  Thus, any claim of a Sixth Amendment speedy trial violation was not "fairly presented" to the state courts and is, therefore, unexhausted and procedurally defaulted. See, e.g., Cann v. Bickle, 2011 WL 7646037, at *7 (E.D.Pa. Mar. 30, 2011)(Strawbridge, M.J.)(approved and adopted, 2012 WL 1957431 (E.D.Pa. May 31, 2012)(Jones, J.).  "A Rule 600 claim, raised purely on state law grounds in state court, cannot be converted into a cognizable federal habeas claim simply by citing to the Sixth Amendment of the United States Constitution in the habeas petition."  Walker, 2013 WL 6667776, at *11 (citing Butler v. Walsh, 2012 WL 5996987, at *5 (DuBois, J.)(E.D.Pa. Nov. 30, 2012)).

Because petitioner's Sixth Amendment speedy trial claim was not fairly presented in state court, it should be dismissed as unexhausted and procedurally defaulted.  In any event, however, the state court's discussion of the Rule 600 claim is instructive in determining that petitioner's speedy trial claim is also meritless.

After carefully considering the Rule 600 claim, the Pennsylvania Supreme Court concluded petitioner was not entitled to relief based on delay caused by the Commonwealth's

interlocutory appeal.  Specifically, the court noted that "as a general rule, delays in bringing a capital defendant to trial that result from appellate resolution of pretrial motion rulings constitutes excusable time" under Rule 600 so long as the Commonwealth exercised due diligence.  Burno II, at 40 (citing, inter alia, Commonwealth v. Boczkowski, 846 A.2d 75, 83 n.7 (Pa. 2004)); Commonwealth v. Hill, 736 A.2d 578, 580-86 (Pa. 1999).  See also Miller v. Klem, 309 Fed.Appx. 628, 630 (3d Cir. 2009)(citing Hill, supra).  The court went on to conclude that, in this case, the Commonwealth had acted with due diligence:

> In this case, it is evidence that the Commonwealth acted with due diligence. The Commonwealth received an unfavorable ruling on a motion that was filed by [petitioner].  The Commonwealth timely filed a motion for reconsideration of that order, and then a timely notice of appeal from the denial of that motion.  In the notice of appeal, the Commonwealth set forth each of the elements of the collateral order doctrine, albeit without actually citing the rule itself.  The Commonwealth plainly indicated in its notice of appeal that it was appealing the order as a collateral order.  The Superior Court did not note the basis upon which it found jurisdiction.  The Superior Court then ruled in the Commonwealth's favor….At all times, the Commonwealth pursued relief from an unfavorable ruling, and without unnecessary delay.

Burno II, at 40-41.

The factual findings of state trial and appellate courts are presumed correct on habeas review.  This presumption which can only be overcome on the basis of clear and convincing evidence to the contrary.  Stevens v. Delaware Correctional Center, 295 F.3d 361, 368 (3d Cir. 2002).  Petitioner has not shown clear and convincing evidence that the Pennsylvania Supreme Court's factual finding – that the Commonwealth pursued relief without unnecessary delay – was incorrect.  Moreover, it is not the province of this habeas court to "reexamine state-court determinations on state-law questions", Estelle, 502 U.S. 67-68 (1991), and petitioner has not shown any extraordinary and compelling circumstances which would justify declining to follow

the Pennsylvania appellate court's application of Rule 600.  Johnson v. Rosemeyer, 117 F.3d

104, 115 (3d Cir. 1997).[10]

---

[10]     Nor has petitioner shown that the state courts violated his Sixth Amendment right to a speedy trial under the balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972).  That test weighs the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.  Id. at 530-32.  None of the factors is dispositive.  Id. at 533.

       Here, petitioner has maintained that the only objectionable delay is the time during which the Commonwealth's interlocutory appeal was pending before the Superior Court.  At most, that time is between April 21, 2005 (the filing of the Commonwealth's notice of appeal) and September 28, 2006 (the denial of petitioner's petition for allowance of appeal in the Supreme Court of Pennsylvania).  That docket is attached as Exhibit E.

       However, in fact, some of that time is attributable to petitioner, who also filed an appeal from the same order, and would have been unavailable for trial during the time his petition for allowance of appeal was pending.  The docket of petitioner's appeal is attached as Exhibit F.  Thus, Respondents aver that the only time attributable solely to the Commonwealth's appeal is from June 29, 2005 (when the Superior Court denied petitioner permission to appeal) through April 21, 2006 (when the Superior Court reversed the trial court's order, ruling in favor of the Commonwealth on appeal), a total of 296 days.  This length of time is not per se oppressive.  See Hakeem v. Beyer, 990 F.2d 750, 761 (3d Cir. 1993)(concluding that "pretrial incarceration of either thirteen or fourteen and one-half months demonstrates per se oppressive pretrial delay").

       For purposes of the second factor, the reason for the delay was the Commonwealth's appeal of the trial court's ruling relegating lead counsel to second chair, an appeal which was ultimately resolved in favor of the Commonwealth.  Thus, the reason for the delay was clearly meritorious and, as the Pennsylvania Supreme Court concluded, was pursued by the Commonwealth without unnecessary delay.  This factor therefore does not weigh in favor of petitioner.

       Third, petitioner did assert his right under Rule 600, but not under the Sixth Amendment.  Therefore, this factor does not weigh in petitioner's favor.

       Finally, with regard to prejudice, petitioner claims in his brief that because of this delay, "he lost his comprehensive trial strategy, including a plan to call certain witnesses that was replaced by a non-existent strategy with no design to call any witnesses.  He lost two (2) documents of exculpatory value, seemingly forever, having not been returned and no knowledge of their whereabouts.  Because of these events he was compelled to testify at trial in order to have some semblance of a defense, when he otherwise would not have….It effectively blocked any chance that A.D.A. Dantos would be called as a witness, something we allege the State feared.  Which was part of [petitioner's] complaint about his new counsel not wanting to call any witnesses at all, other than [petitioner], which is exactly what happened."  (Petitioner's brief, at 46-47).

       Petitioner's allegations about prejudice are vague and conclusory, and do not warrant habeas relief.  Moreover, they essentially sound in ineffective assistance of counsel.  All of his claims of ineffective assistance of counsel are waived because he refused to raise them on PCRA review and, indeed, the state courts never had a chance to address them.  Nor did the state court have an opportunity to address the alleged prejudice resulting from the Commonwealth's appeal, because he did not frame his speedy trial complaint in the Sixth Amendment context.  However, the state courts' discussion of petitioner's Rule 600 claim is instructive for purposes of the first two Barker factors, showing that neither the length of the objected-to delay nor the reason for the delay weigh in favor of petitioner's claim for relief.  Accordingly, even to the extent this Court concludes the Sixth Amendment claim is exhausted, it should nevertheless be denied as meritless.

Accordingly, Ground Two should be dismissed as unexhausted or, alternatively, denied as meritless.

Ground Three

Ground Three alleges petitioner was denied his right to self-representation on appeal and that he was forced to accept "hybrid" representation.  This claim is unexhausted.  Petitioner appears to concede that it is unexhausted, suggesting that he nevertheless can obtain "de novo review" in this Court because the "State trial and Supreme courts failed to alleviate the obstacles to a full and fair state review and have instead, obstructed [petitioner's] attempts to obtain state remedies.  Also with counsel's deliberate actions that initiated the obstructionism, this is axiomatically ineffective purely on the face of it and under the holdings found in Roe v. Flores, 120 S.Ct. 1029 (2000) and that line of cases."  (Petitioner's brief, at 56.)

To whatever extent petitioner alleges his efforts to represent himself in state court were "obstructed" by his appointed counsel in an "axiomatically ineffective" way, this claim of ineffective assistance of counsel should have been raised in a PCRA petition which, as discussed above, petitioner has refused to do.  Moreover, his claim that the state courts "obstructed his attempts to obtain state remedies" also should have been exhausted.

In any event, his claim fails on the merits because there is no constitutional right to self-representation on direct appeal from a criminal conviction.  Martinez v. Court of Appeal of California, Fourth Appellate Dist., 528 U.S. 152, 163 (2000).  On the contrary, with regard to appeals, states are "clearly within their discretion to conclude that the government's interests [in the fair and efficient administration of justice] outweigh an invasion of the appellant's interest in self-representation."  Id.  Moreover, although the Supreme Court in Martinez noted that states were, of course, free to recognize such a right under their state constitutions, here, Pennsylvania

18

has not done so.  For example, the Supreme Court of Pennsylvania has concluded it is

appropriate to deny a capital defendant's request to proceed pro se where doing so would

"unnecessarily impede and completely disrupt and already delayed appellate process."

Commonwealth v. Staton, 12 A.3d 277, 283 (Pa. 2010).  Indeed, that is exactly what happened

here.  See supra at n.7.  Moreover, petitioner's right to adequate representation was in no way

impeded here, "as he was free to raise counsel's effectiveness at a later time."  Staton, 12 A.3d at

414.  Petitioner's persistent refusal to do so precludes his ability to obtain relief from this Court.

Because petitioner has not demonstrated that the denial of his request to represent himself

on appeal resulted in any violation of clearly established federal law, his claim in Ground Three

should be denied as unexhausted and meritless.

Ground Four

Ground Four alleges there was no probable cause to arrest petitioner and, therefore, his

subsequent statement to police should have been suppressed.  Initially, as discussed above, any

claim of ineffective assistance of counsel in Ground Four must be dismissed as unexhausted and

procedurally defaulted.  In any event, the claim is meritless.

Petitioner claims that the arrest warrant's  affidavit of probable cause "alleged nothing

more than [petitioner's] presence at the scene", which police learned from his codefendant

Terrance Bethea who, according to petitioner, police already considered to be a "very unreliable,

polluted source, whose statement and or testimony must be viewed with extreme caution."

(Petitioner's brief, at 75.)  Petitioner further claims the affidavit fails to indicate that petitioner

"was anything more than a possible witness" and that it intentionally left out Bethea's claim to

police that "[Petitioner] didn't shoot anyone".  (Petitioner's brief, at 76.)

The Pennsylvania Supreme Court thoroughly addressed this issue, applying both state and federal law.  "Probable cause for the issuance of an arrest warrant must be determined by someone independent of police and prosecution."  Gerstein v. Pugh, 420 U.S. 103, 118 (1975). Probable cause to arrest exists if "the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that petitioner had committed a crime.  Hunter v. Bryant, 502 U.S. 224, 228 (1991)(quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  Such a determination requires a totality of the circumstances test.  Illinois v. Gates, 462 U.S. 213 (1983).  "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts'" and should be reviewed without a "grudging or negative attitude".  Id. at 236.

The state courts' analysis of petitioner's arrest warrant in this case was both complete and correct.  Conceding that, as petitioner argues, "the affidavit was not rife with information implicating him as one of the murderers" (Burno II, at 18), the Pennsylvania Supreme Court nevertheless concluded the affidavit of probable cause did establish the probability that petitioner was involved in the murders and that, at a minimum, it was probable that petitioner was at least an accomplice if not a principal actor. Id. at 19.  In so concluding, the Court noted the following:

> The affidavit established without question that Juarbe and Rosado were murdered.  The affidavit contained statements from Ms. Moyer, who indicated that she heard gunshots and saw two men fleeing the scene in a maroon car.  Records discussed in the affidavit revealed that [petitioner] owned a similarly colored car.  The affidavit further set forth the forensic evidence that tied Bethea to the murders.  Bethea, who was wounded in the leg during the shootout, placed [petitioner] at the scene of the crime, which also made it probable that [petitioner] was one of the two men who fled the scene shortly after Ms. Moyer heard gunshots.  There was no forensic evidence to suggest that any other perpetrators were present at the scene.
>
> This information suggested more than [petitioner's] mere presence at the scene.  [Petitioner's] presence at the scene, plus the fact that two people were seen hastily fleeing the scene soon after the gunshots, plus

> [petitioner's] assistance in Bethea's escape in a car belonging to [petitioner], plus [petitioner's] unwillingness to discuss the events with Bethea's wife, collectively produce at least a probability that [petitioner] was a participant in the murders."

Burno II, at 18-19.

All of these conclusions are reasonable inferences drawn from the four corners of the affidavit of probable cause, and, under the totality of the circumstances, show that the police had reason to believe petitioner was involved in the murders.  Moreover, as the Court noted, there was probable cause to arrest petitioner as an accomplice even if he is right that Bethea told police two other men committed the murders.  Under Pennsylvania law, an accomplice is liable if he "acts with the intent of promoting or facilitating the commission of an offense and agrees or aids or attempts to aid such other person in either the planning or the commission of the offense." Commonwealth v. Cox, 68 A.2d 1279, 1286 (Pa. 1996).

Petitioner has not shown that the state courts applied clearly established federal law in any incorrect, let alone objectively unreasonable, way.  On the contrary, the Pennsylvania Supreme Court's analysis is fully correct in light of the totality of the circumstances. Gates, 462 U.S. 213.  Petitioner certainly has not shown that the ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement."  Harrington, 562 U.S. at 103.  Further, because the arrest was not illegal, petitioner's statements were not suppressible as the "fruit of the poisonous tree".  Accordingly, his claims in Ground Four that the affidavit of probable cause led to an illegal arrest and that his statement to police were necessarily obtained illegally, are unfounded and should be denied. [11]

---

[11]     Petitioner alleges in Ground Four that his statements to police were coerced, claiming that "[t]he police used this illegal arrest as a means to pressure and coerce [petitioner] into confessing" and that "[h]aving not one scintilla of evidence against him," police engaged in a "glorified fishing expedition" meant to apply pressure to petitioner and get him to confess.  (Petitioner's brief, at 81-82.)  However, this claim is more fully articulated in Ground Five.

Ground Five

Grounds Five, Six, and Seven concern petitioner's September 26, 2003 statement to police.  In Ground Five, he alleges "prosecutorial misconduct," specifically that petitioner was coerced into making a false confession by the prosecutor during an unrecorded, unmirandized interview he was "forced to attend", at which his attorney was not present.  He also alleges in Ground Five that his trial counsel failed to raise this claim.[12]

The Pennsylvania Supreme Court addressed the admissibility of the September 26, 2003 statement on direct appeal, and correctly determined that it was not coerced, but rather were given voluntarily.  There is no error in the state court's ruling here.

Petitioner gave several statements to police.  As discussed more fully in the Pennsylvania Supreme Court's February 22, 2017 Opinion on direct appeal, he gave his first statement on September 24, 2003, upon his arrest.  At that time, petitioner met with detectives, his attorney, the prosecuting attorney, then-First Assistant District Attorney Maria L. Dantos.  The parties agreed that in exchange for a truthful statement, guilty plea, and testimony against Bethea, the Commonwealth would not seek the death penalty against petitioner.  However, petitioner went on to tell police he had nothing to do with the murders but in fact had been outside the apartment while Bethea committed the crimes himself.  Because the Commonwealth did not believe this story, on September 26, 2003, petitioner underwent a polygraph, which he failed.  When he was told he had failed the polygraph, petitioner became upset and then gave a two-part inculpatory statement to police.  During the first part, petitioner's attorney was not present, but he arrived

Therefore, the extent to which his statements to police were knowingly, intelligently and voluntarily made is discussed below with respect to Ground Five.

[12]      As discussed above, any claim of ineffective assistance of counsel is procedurally defaulted for failure to raise it in a PCRA petition.

and was present during the second part.  The trial court suppressed the first part of the statement,

but allowed admission of the second part at trial.

Petitioner claims he was coerced by the prosecution during the first part of his confession

when his attorney was not present and therefore, he claims the entirety of his confession should

have been suppressed.  The Supreme Court correctly decided this issue and its conclusion that

the statement was given voluntarily is entitled to deference.

As the Court held, petitioner's statement was not coerced.  Under federal law, a statement

is involuntary when the suspect's "will was overborne in such a way as to render his confession

the product of coercion."  Arizona v. Fulminante, 499 U.S. 279, 288 (1991).  This analysis

requires consideration of the totality of the circumstances of the interrogation.  Dickerson v.

United States, 530 U.S. 428, 434 (2000).  "These surrounding circumstances include 'not only

the crucial element of police coercion,' but may also include 'the length of the interrogation, its

location, its continuity, the defendant's maturity, education, physical condition, and mental

health.'"  Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002)(internal citations omitted) (quoting

Colorado v. Connelly, 479 U.S. 157, 167 (1986) and Withrow v. Williams, 507 U.S. 680, 693

(1993)).  Although the Pennsylvania Supreme Court analyzed the totality of the circumstances as

articulated by its own Court, its analysis is nevertheless consistent with clearly established

federal law.  Petitioner has not shown that the state courts' analysis was inconsistent with federal

law in any way.

The Pennsylvania Supreme Court discussed petitioner's voluntariness claim as follows:

> In this case, the totality of the circumstances demonstrates that Burno's
> actions were voluntary at every juncture, including the point at which he
> provided his ultimate confession.  Burno had the assistance of counsel at
> every stage of the process.  Attorney Clark was present to negotiate the
> initial deal with ADA Dantos that would have taken the death penalty off
> the table for Burno.  Attorney Clark advised Burno to provide a truthful

23

statement, and was consulted before and after Burno took (and failed) the polygraph examination.  Following some delay, ADA Dantos was able to reach Attorney Clark after Burno failed the test, whereupon Attorney Clark advised Burno to speak with the police and gave permission to begin the interrogation without him.  Attorney Clark eventually arrived, spoke with Burno, and sat with Burno during the final confession.  Throughout the process, the detectives provided Burno with <u>Miranda</u> warnings on three separate occasions.  There is no indication that Burno failed to understand his rights, or that he was at any time unaware of his right to insist upon the presence of his attorney or of his right to remain silent.

None of the factors set forth in [<u>Commonwealth v. Perez</u>, 845 A.2d 779, 787 (Pa. 2004)] were present here in a manner suggesting that Burno was coerced into confessing.  Burno acted of his own free will and/or on the advice of counsel.  None of the interrogations was extensive, nor were they performed in a way that debilitated or weakened Burno's psychological functions.  There was no evidence that the police were threatening, abusive, or unduly coercive.  This clearly was a collaborative effort by Attorney Clark and Burno to pursue a course of action that could result in a benefit to Burno.  None of it was forced by ADA Dantos or the police officers.

The fact that ADA Dantos spoke with Burno without Attorney Clark's presence did not render the confession involuntary.  ADA Dantos spoke with Burno after he requested to speak with Attorney Clark once Burno failed the polygraph test.  ADA Dantos sought only to inform Burno that she was trying to contact Attorney Clark and that she was unable to reach him at that moment.  Burno started crying and professing his regret for not telling the truth.  It was Burno's conduct that spawned any discussions regarding the case.  There is no evidence to suggest that ADA Dantos met with Burno in an effort to extract a confession, or that she maneuvered to speak to Burno without Attorney Clark's permission or knowledge.  More importantly, there is nothing about this interaction to suggest that the confession that Burno provided the police later was involuntary as a result of ADA Dantos' statements.  She merely told him that he should tell the truth and that, if he did, she and the detectives would reassess the future of the case.

Similarly, after Burno had failed the polygraph test, he bemoaned to the polygraph examiner that his failure meant that no one could save him from the punishment he was facing.  The examiner responded that telling the truth generally is one way in which a person could help himself.  This lone statement can hardly be said to be coercive, let along so unduly coercive that Burno's confession, which he made following <u>Miranda</u> warnings and after speaking with counsel multiple times, must be considered involuntary.

<u>Burno II</u>, at 33-35.

The state courts' factual findings are presumed correct on habeas review. Petitioner has shown no clear and convincing evidence to the contrary. Stevens, 295 F.3d at 368. His assertion that he has "repeatedly testified that D.A. Dantos coerced him to confess" does not make it true that there actually was coercion. (Petitioner's brief, at 86). Nor is there support for his claims that the prosecutor "was urging him to confess". (Id. at 88.) On the contrary, as the state courts found, there is no evidence that she did anything "in an effort to extract a confession"; rather, petitioner's statement was fully voluntary. Burno II, at 35. The state court's discussion of the totality of the circumstances clearly demonstrates that petitioner's will was not overborne. Fulminante, 499 U.S. at 288. Accordingly, petitioner's claim that his entire September 26, 2003 statement should have been suppressed as involuntary fails, and Ground Five should be denied.[13]

Ground Six

In Ground Six, petitioner claims the trial court also should have suppressed the September 26, 2003 statement because it was made during "plea negotiations/discussions", and that his trial counsel was ineffective in failing to raise the issue. The Pennsylvania Supreme Court agreed with petitioner that his statement had been made during plea negotiations and should not have been admitted, but nevertheless concluded its admission was harmless error because it was cumulative of other, fully admissible evidence. This conclusion is fully reasonable.

In determining whether a trial error is harmless, the reviewing court must determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 627 (1993). Where the reviewing court is in

---

[13]    Although petitioner's claim of ineffective assistance of counsel in Ground Five is procedurally defaulted, it also fails on the merits for the same reasons. There is "no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument." United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999).

"grave doubt" about whether the error was harmless – that is, if "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error" – then the error is not harmless, and the petitioner prevails.  O'Neal v. McAninch, 513 U.S. 432, 436 (1995).

Under Pennsylvania law, error is considered harmless where: "(1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict."  Commonwealth v. Foy, 612 A.2d 1349, 1352 (Pa. 1992).

Here, the Pennsylvania Supreme Court concluded that error was harmless under the second prong, that is, that it was cumulative of other, properly admitted evidence.  In so doing, the Court cited the test set forth in Commonwealth v. Story requiring three elements to be met before a court can conclude harmless error on this ground:

> There should be substantial similarity, in type of evidence and incriminating factual details, between the tainted evidence and the untainted evidence of which it is 'cumulative'.  (2) The untainted evidence should be indisputable, either because the facts are in some way affirmatively accepted by the defendant or for other reasons.  (3) Care should be taken that the 'untainted' evidence in no way derives from the tainted evidence.

Burno II, at 28, quoting Story, 383 A.2d 155, 165 n.21 (Pa. 1978).  Reviewing the full record, the Pennsylvania Supreme Court went on to conclude that petitioner's statement to police on September 26, 2003 was substantially similar to incriminating admissions petitioner made during phone calls from the jail, which were recorded, and indisputably made by petitioner.  Nor were the phone calls in any way tainted.

26

Describing the "tainted evidence", the Court noted that "During his plea statement, [petitioner] explained in detail how he and the co-defendant went to the victims' house on the night of the murders.  [Petitioner] admitted that he shot one of the victims at least three times with a 9mm handgun.  He also admitted to shooting the other victim."  Burno II, at 29.  The Court also characterized the "untainted" evidence – the jail tapes – as "essentially repeat[ing] the same incriminating factual details he made during his plea statement".  Specifically, petitioner had admitted to shooting one of the victims multiple times; admitted he had a 9mm handgun; that he "deaded some people"; that he had already "copped to" the murders; he placed himself at the scene; and he "talked about the guns he dismantled and disposed of after the crimes"; and attempted to get his wife to get in touch with Bethea to "get their stories straight".  Burno II, at 29.

Based on all of these details, the Court found the "tainted" and "untainted" evidence were substantially similar; that the jail calls were indisputably made by petitioner; and that the jail tapes were in no way derivative of the plea statement.  Thus, under Story, the Court concluded the plea statement was cumulative of the jail tapes, and therefore, the error in admitting the plea statement was harmless.

Petitioner has not shown that this conclusion was objectively unreasonable or, in fact, that it was even erroneous.  He has not shown that the error had a substantial and injurious effect on the jury's verdict.  Brecht, 507 U.S. at 627.   On the contrary, the cumulative nature of the evidence shows that it likely did not have a substantial effect, because the jury was already hearing the same evidence from petitioner's own jail calls.

A federal habeas court may not issue a writ of habeas corpus "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly." Williams, 529 U.S. at 410.  Rather, to

warrant habeas relief, the state-court ruling must be "objectively unreasonable". Id. at 409.

There is no basis for any such finding here.  On the contrary, it is clear that the Pennsylvania

Supreme Court was not in any "grave doubt" about the harmlessness of the error.  Petitioner has

shown no reason to disturb the state court's conclusion, and he should not be granted any relief

on Ground Six.

Ground Seven

Finally, Ground Seven argues that the second half of petitioner's September 26, 2003

should have been suppressed because the Commonwealth did not show that "the taint had been

purged".  While assuming, but not concluding, that the trial court correctly determined the first

part of the statement was unlawfully obtained because counsel was not present, the Pennsylvania

Supreme Court went on to conclude the second part of the statement was not unconstitutionally

tainted by the first part.  As the Supreme Court discussed,

> [Not all evidence] is "fruit of the poisonous tree" simply because it would
> not have come to light but for the illegal actions of the police.  Rather, the
> more apt question in such a case is whether, granting establishment of the
> primary illegality, the evidence to which instant objection is made has been
> come at [sic] by exploitation of that illegality or instead by means
> sufficiently distinguishable to be purged of the primary taint.

Burno II, at 31 (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)).  "The relevant

question is whether the confession 'was sufficiently an act of free will to purge the primary taint

of the unlawful confession.'" Id. (quoting Wong Sun, 371 U.S. at 486).  The state court then

employed the test articulated by the United States Supreme Court in Brown v. Illinois,

considering the following factors: (1) whether Miranda warnings were given; (2) the 'temporal

proximity' of the illegal police conduct to the confession; (3) the presence of intervening

circumstances or events; (4) the 'purpose and flagrancy of the official misconduct'.  Brown v.

28

Illinois, 422 U.S. 590, 603-04 (1975).  The court further noted that "where confessions occur in brief succession, with the first one being illegally obtained, the prosecution must demonstrate facts 'sufficient to insulate the [second] statement from the effect of all that went before." Burno II, at 31 (quoting Clewis v. Texas, 386 U.S. 707, 710 (1967)).

      Having correctly articulated the applicable, clearly established federal law, the Pennsylvania Supreme Court went on to determine that defense counsel's appearance "very clearly suffice[d] as an intervening event that removed the only taint found by the trial court and broke the chain of events so as to insulate the second statement from the first." Burno II, at 32. Moreover, the court noted that Miranda warnings had been given; and that petitioner was fully acting of his own free will and, as discussed above, was not coerced into giving any part of the statement.  Additionally, for purposes of the fourth prong, the court concluded that in light of defense counsel having given police permission to conduct the first part of the interview without his presence, the police misconduct – to the extent it was, in fact, misconduct – was not purposeful or flagrant.

      The state courts' factual determinations are presumed correct on habeas review, and petitioner has shown no clear and convincing evidence to the contrary.  Stevens, 295 F.3d at 368. Nor has he shown that the state court applied federal law in any objectively unreasonable way. Williams v. Taylor, 529 U.S. at 409.  On the contrary, the state court's determination that any taint from the first part of the September 26, 2003 statement was sufficiently purged by the arrival of defense counsel fully comports with federal law.  Accordingly, no relief is due on Ground Seven.

*Conclusion*

For all the foregoing reasons, and for all the reasons articulated by the Pennsylvania Supreme Court in its February 22, 2017 Opinion affirming petitioner's judgment of sentence, Respondents respectfully request that the Petition for Writ of Habeas Corpus be denied and/or dismissed in its entirety, without a hearing, and that no certificate of appealability be issued.

Respectfully submitted,

HEATHER F. GALLAGHER
Chief of Appeals

/s/ CHRISTINE F. MURPHY
Deputy District Attorney
Lehigh County Courthouse
455 West Hamilton Street
Allentown, Pa  18101
Tel. No. (610) 782-3100
*Attorney for the Respondents*

30